**Dorothy I. FEIST, individually and as trustee for the heirs and next of kin of Brian Keith Feist, deceased, Plaintiff,**

v.

**Bradley Jon SIMONSON, Kim Johnson, Robert Glasrud, Matthew Blade, Craig Nordby and the City of Minneapolis, Defendants.**

No. CIV. 97–1882 ADM/AJB.

United States District Court,
D. Minnesota.

Feb. 8, 1999.

---

Robert Bennett, Bennett, Brown & McNeil, P.A., Minneapolis, MN, for Plaintiff.

Timothy S. Skarda, Burt T. Osborne, Assistant City Attorneys, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

MONTGOMERY, District Judge.

## I. INTRODUCTION

Defendant's Motion for Summary Judgment in the above-entitled matter came on for hearing before the undersigned United States District Judge on November 10, 1998. Dorothy Feist commenced this action against the City of Minneapolis ("City") and members of the Minneapolis Police Department ("MPD") seeking damages resulting from the death of her son, Brian Keith Feist ("Feist"). Plaintiff claims that Feist, an innocent bystander to a high-speed police chase, was killed as a result of unconstitutional conduct on the part of the City and its officers. She alleges claims of: (1) civil rights violations by Defendants Simonson, Johnson, Glasrud, and Blade under 42 U.S.C. § 1983 ("section 1983"), specifically deprivation of liberty without due process of law, unreasonable sei-

zure, unreasonable interference, unreasonable force, and deprivation of a substantive due process right to parenthood (Count I); (2) civil rights violations by Defendant City under section 1983, for allowing its officers to engage in a pattern and practice of illegal high-speed pursuits in reckless disregard for the health and safety of the general public (Count II); (3) a civil rights violation by Defendant Nordby under section 1983 due to his deliberate indifference to and/or tacit authorization of the unconstitutional conduct of his subordinate officers while involved in high speed pursuit (Count III); (4) conspiracy to violate Plaintiff's civil rights under section 1983 by Defendants Simonson and the City of Minneapolis through, *inter alia*, filing false police reports, making false statements to accident investigators, inadequately investigating the incident, and attempting to subvert Plaintiff's attempts to bring a civil rights action (Count IV).

For the following reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## II. BACKGROUND [1]

### A. The Chase

On August 11, 1996, at approximately 3:36 p.m., MPD Officer Bradley Simonson ("Simonson") was driving westbound on Lake Street (a two-way street running from east to west) while on traffic patrol in south Minneapolis. *See* Simonson Aff., ¶ 4. Simonson noticed a black Ford Galaxy, Minnesota license number 067 MRM traveling east on Lake Street. *Id.* at ¶ 7. Simonson observed that the vehicle matched the reported description of a stolen vehicle. *Id.* at ¶ 6; *see also* Bennett Aff., Ex. BB at 40 (Simonson Deposition). Simonson immediately made a U-turn and began traveling eastbound on Lake Street in pursuit of the vehicle. *See* Simonson Aff., ¶ 8. Simonson did not activate his lights or sirens at this time. *Id.*

Simonson remained in pursuit as the vehicle turned northbound onto Park Avenue and then signaled for the driver to stop. *See*

---

**1.** In light of the summary judgment posture, the facts are set forth in the light most favorable to the Plaintiff.

Bennett Aff., Ex. BB, at 40. Simonson exited his squad car and approached the vehicle with his weapon drawn. *See* Simonson Aff., ¶ 11. In the car was the driver, an 18–year-old man later identified as Darren Don Shannon ("Shannon"), and another passenger, Frank Leonard Penny. *See* Pl.Ex. 31. Simonson twice ordered the vehicle occupants to put their hands in the air, but neither individual obeyed this command. *Id.* After a third request by Simonson, the driver "looked at [Simonson] and said 'fuck you,' punched the car and took off." Bennett Aff., Ex. BB, at 43.

Simonson immediately sprinted back to his squad car, activated his lights and siren, and notified MPD dispatch that he was involved in a chase with an allegedly stolen vehicle driven by Shannon. *See* Simonson Aff., ¶ 15. Simonson then began to pursue the vehicle northbound on Park Avenue, trailing by approximately one to one and one-half blocks. *Id.* at ¶ 16. The vehicle turned left, heading westbound on East 28th Street. *Id.* at ¶ 17. East 28th Street is a one-way street heading eastbound. *Id.* Simonson also turned the wrong way onto East 28th Street in pursuit of Shannon, who nearly caused several accidents and struck multiple construction barrels as he drove against the direction of traffic. *Id.*

The vehicle then turned north onto Stevens Avenue, a northbound one-way street, where it continued traveling at a high rate of speed and sped through a stop sign at 26th street. *Id.* at ¶ 21. With Simonson approximately one block behind the vehicle, Shannon ran another stop sign and turned right, heading eastbound on 24th street. *Id.* at ¶ 23. The two vehicles proceeded to continue their chase through the streets of Minneapolis, turning north onto 3rd Avenue (running through a stoplight and nearly hitting another vehicle), east onto Franklin Avenue, and then north onto Portland Avenue, a busy southbound one-way street. *Id.* at ¶ 25.

After traveling a couple of blocks down Portland, Shannon turned the vehicle left, heading west on 19th Street and then right, northbound on 5th Avenue. *Id.* at ¶ 27. From 5th Avenue, Simonson observed the vehicle drive onto the eastbound on-ramp of interstate highway 94 ("I–94"). *Id.* at ¶ 28. As he entered I–94, Shannon began to accel-

erate away from Simonson. *Id.* Simonson observed Shannon move from the far left lane of eastbound I–94 across all three lanes of traffic (nearly causing several more accidents), drive across a grassy median, and exit the interstate onto southbound Hiawatha Avenue. *Id.* at ¶ 30.

Simonson continued to follow the vehicle onto Hiawatha, traveling southbound to somewhere between 18th and 19th Streets East. *See* Bennett Aff., Ex. BB at 49. Shannon then made a U-turn and began a course directly facing Simonson, driving past him on the driver's side of the car. *Id.* Shannon next drove back onto the on-ramp coming from eastbound I–94 and reentered the interstate, this time traveling against the flow of traffic. *See* Simonson Aff. at ¶ 33.

Simonson, joined in his pursuit by three other squads driven by Officers Matthew Blade ("Blade"), Kimberly Johnson ("Johnson"), and Robert Glasrud ("Glasrud"), maneuvered his squad car in the opposite direction and followed Shannon back onto I–94, shadowing Shannon's driving pattern in a westerly direction on eastbound I–94. *Id.* at ¶ 39. Shannon's vehicle, now with a total of four MPD squad cars in pursuit, drove erratically down I–94, forcing several oncoming drivers off the road to avoid being hit. *Id.* at ¶ 36. Shannon's vehicle wove back and forth through all of the lanes of traffic and traveled at speeds of over sixty miles per hour. *See* Bennett Aff., Ex. BB, at 57. The four MPD squad cars followed Shannon, mirroring his driving pattern. *See* Bennett Aff., Ex. M, at 34. The oncoming traffic on eastbound I–94 was also traveling at approximately sixty miles per hour, producing closing speeds of between 110 and 150 miles per hour, according to Corporal John Dennig of the Minnesota State Highway Patrol. *See* Bennett Aff., Ex. P, at 39. Shannon drove back and forth across all of the lanes of traffic on I–94 and through the tunnel under interstate highway 35 ("I–35"). *See* Bennett Aff., Ex. BB, at 65–66. Upon exiting the tunnel, Shannon again drove back and forth across the lanes of traffic, with the officers in pursuit. *Id.* Simonson admitted that he followed the vehicle across multiple lanes of traffic at least three times during the chase.

*Id.* at 64–66. After clearing the tunnel under I–35, Shannon and the squad cars were only seconds from the longer and more narrow Lowry Hill tunnel. *See* Bennett Aff., Ex. X, at 28.

Sgt. Craig Nordby ("Nordby"), the chase supervisor, testified that once the chase entered I–94 he did not have any information about the traffic level because Simonson and the other officers were not calling out the traffic conditions. *Id.* at 22. He was also unaware of the number of squad cars involved in the chase. *Id.* at 23. In an effort to get closer to the chase, Nordby left the precinct house and headed toward I–94. He testified that he was concerned because, "it seemed like the chase had gone on for quite a long time and it had become dangerous going down the wrong way." *Id.* at 24. He explained that he was about to call off the chase because of the serious public danger of the upcoming Lowry Hill tunnel. *Id.* at 28.

Before the chase was called off, however, the accident occurred. Feist, a limousine driver employed by L.C.L. The Bus Sedan, Inc., was driving alone in a Lincoln Towncar, heading eastbound on I–94. *See* Complaint, ¶ 35. Just west of the 5th Avenue bridge, eastbound traffic began to slow almost to a halt due to the approaching pursuit. *Id.* at ¶ 36. Feist braked hard and swerved onto the right shoulder to avoid striking the car in front of him. *Id.* As he turned onto the shoulder, Shannon struck Feist's vehicle at a closing speed estimated at 97–104 miles per hour. *See* Bennett Aff., Ex. P, at 38. Feist was immediately crushed by the force of the impact. *Id.* He was pronounced dead before he was removed from the vehicle. *Id.* Shannon suffered substantial injuries but survived the crash.

Though Simonson initially testified that he did not witness the collision, he later admitted that he was close enough to see the crash. *See* Bennett Aff., Ex. BB, at 35–36, 77; *see also* Pl. Exs. 29, 34. Each of the other three officers, following just car lengths behind Simonson, testified that they saw the Shannon vehicle collide with Feist's vehicle. *Id.* at Exs. V, N.

In sum, the chase lasted over six minutes and covered over six miles, 1.2 of which were traveled in the wrong direction down I–94.

Post-chase investigation showed that the Ford Galaxy driven by Shannon had been taken on a test drive from a location in Brooklyn Park and not returned. *See* Bennett Aff., Ex. EE, at 43.

## B. MPD High Speed Chase Training and Regulations

### 1. *MPD Training*

Sgt. John T. Johnson ("Sgt. Johnson") has conducted pursuit-driving training for the MPD since 1982. *See* Bennett Aff., Ex. U, at 6. At the time of the accident, the MPD did not conduct any behind-the-wheel training as part of its pursuit training, limiting the instruction to a classroom setting. *Id.* at 6–7, 10. In his lectures, Sgt. Johnson emphasizes the negative consequences that can result from adrenaline-fueled pursuits, including civil liability for the City. *Id.* at 24, 54.

Sgt. Johnson testified that he teaches officers not to use poor judgment in pursuits, such as "duplicating the driving conduct of the fleeing vehicle" (the "train and caboose") and turning the chase into a "personal challenge." *Id.* at 73. Sgt. Johnson also teaches that officers have no duty to continue a chase when the public is in danger, but rather that they should evaluate the appropriateness of continuing the chase at each stage of events. *Id.* at 30.

### 2. *Department Policy*

Section 7–400, *et seq,* of the MPD Manual codifies the department's pursuit policy ("Pursuit Policy"). *See* Def. Mem. in Supp. of Summ. J., Ex. 4. Section 7–403 of the Pursuit Policy states that "vehicular pursuits will be limited to the primary squad and two secondary squads unless authorized by a superior officer." *Id.* Section 7–405 states that "the pursuit shall be limited to the initial vehicle and two others. Other vehicles are not to engage in the pursuit unless otherwise ordered to do so by a superior officer." *Id.* Defendants acknowledge that the pursuit of Shannon included four squads and that no permission for the extra vehicle was requested from or provided by a superior officer.

Section 7–406 states that:

In the following circumstances, officers shall not initiate or continue pursuit: ... (2) risks due to weather, road conditions, vehicle and/or pedestrian traffic outweigh the necessity to immediately arrest the suspect; (3) the seriousness of the offense or offenses committed is such that a continued pursuit creates unreasonable risks to the officers and the public.

*Id.* Section 7–404 of the Pursuit Policy states that superior officers shall be responsible for monitoring pursuits and "have the authority and responsibility to decide whether to commit additional squads or to call off the pursuit if they believe that the risk to the public and officers outweighs the necessity to immediately arrest the suspect." *Id.* This chase was at no time called off by the superior officer. *See* Def. Mem. in Supp. of Summ. J., at 9.

### 3. *Post–Incident Investigation*

Other than the investigation relating to the criminal charges filed against Shannon, there was no internal investigation of the MPD's conduct during the incident. *See* City Stipulation, Bennett Aff., Ex. U, at 60. Although Chief Olson testified that this chase "should have been reviewed," there was no post-action evaluation of the appropriateness of the officers' actions. *See* Bennett Aff., Ex. Y, at 49–50, 74. In fact, the individual officers involved in the incident confirmed that they were never questioned, interviewed, criticized, or investigated for their conduct. *See* Bennett Aff., Exs. M, at 67–69; W, at 62–63; S, at 63; V, at 94–97; EE, at 137; and N, at 11–13.

Minn.Stat. section 626.5532 requires each police department to file a notice with the Commissioner of Public Safety within thirty days following a pursuit. The notice requires information about the reasons for and circumstances surrounding the pursuit, as well as details as to any injuries suffered by officers or the public. *See* Pl.'s Ex. 67. On August 17, 1989, the City publicly affirmed their intent to comply with this regulation. *See* Pl.'s Ex. 68. However, no such report was filed with the Commissioner of Public Safety in this case. *See* Bennett Aff., Ex. Y, at 42; Pl.'s Ex. 61.

### 4. *Chase Reactions*

Many law enforcement officers, both within and outside the MPD have testified as to their perceptions of the Shannon chase. Sgt. Johnson, the MPD pursuit instructor, testified that he would probably not have chased a stolen car the wrong direction down the interstate. *See* Bennett Aff., Ex. U, at 51. He acknowledged that, in order to pursue a vehicle the wrong way on an interstate highway, a "very hazardous situation," the crime for which the vehicle is being pursued must be very serious. *Id.* at 95–96. He admitted that, "you need a damn good reason to chase somebody into a highly dangerous traffic situation." *Id.* Similarly, MPD Officer Alan Rathbun acknowledged that chasing a car the wrong way down the interstate "creates an unreasonable risk of danger to the public," and Chief Olson admitted that such a chase represents an "inherently dangerous activity." *See* Bennett Aff., Exs. AA, at 31; Y, at 23. Chief Olson also testified that auto theft is "on the low end of the felony spectrum" and catching a car thief is "not worth taking a citizen's life." *Id.* at 24–25.

Corporal Dennig explained that, "once you start jeopardizing somebody, you know, the situation of going the wrong way down the freeway, for somebody if it's a second stolen car, he's not going to jail. Forget it. Not done." *See* Bennett Aff., Ex. P, at 34. In his opinion, the officers should have rammed the vehicle and not allowed it to get onto I–94 in the first place. *Id.* at 31. Simonson himself testified when heavy traffic is encountered in a chase, the risk to the public probably outweighs the benefits of apprehending the suspect. *See* Bennett Aff., Ex. EE, at 128.

Simonson also admitted that, in over fifty percent of police chases, the suspect "bails" or jumps out of the car, a scenario especially likely with juvenile suspects. *See* Bennett Aff., Ex. EE, at 30–31. The MPD had officers, including Officer Rathbun, stationed adjacent to I–94 in order to assist in the apprehension of Shannon if he had "bailed." *See* Bennett Aff., Ex. AA, at 13–14; Pl.Ex. 18. Officer Nordby testified that "bailing" was a distinct possibility, had the MPD not pursued the vehicle down I–94. *See* Bennett Aff., Ex. X, at 53. He also acknowledged that, in the

absence of police pursuit, Shannon may have turned the car and maneuvered it in the correct direction. *Id.*

### 5. *Officer Simonson*

Officer Simonson, the driver of the primary squad during the chase, has been involved in over 100 high-speed chases during his ten-year career. *See* Bennett Aff., Ex. EE, at 24. In some months, Simonson was a party to as many as twelve to fifteen chases. *Id.* Simonson has never terminated a chase under any circumstances during his career. *Id.* at 90. The August 11, 1996 chase was the longest chase Simonson had been involved in since 1992. *Id.* at 174–75. He has never been disciplined for any of his pursuits over the course of his career. *Id.* at 18. Simonson's conduct at the conclusion of a high speed chase in 1990 led to the City paying a large settlement to two suspects allegedly beaten by Simonson. *See* Bennett Aff., ¶ 3. Allegations in that case were that Simonson lied to investigators and falsified testimony regarding the victim's injuries. *See* Bennett Aff., Ex. C, at 17.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of stating grounds for its motion and demonstrating the lack of issues of genuine material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Having done so, the opposing party may not simply rest on the allegations or denials of its pleadings, but must come forward with sufficient evidence

to demonstrate a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When evaluating the parties' submissions on a motion for summary judgment, the evidence of the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." 477 U.S. at 255, 106 S.Ct. at 2513. Consequently, the facts must be stated and analyzed in the light most favorable to the Plaintiffs. A dispute concerning a material fact is "genuine" and sufficient to overcome a summary judgment motion "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510.

Ordinarily, the Court's task on a motion for summary judgment is not to weigh facts or evaluate the credibility of affidavits and other evidence. The nonmovant cannot, however, avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact that is alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club. Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992).

### B. Individual Officer Liability

#### 1. *Constitutional Violations*

Plaintiff's section 1983 [2] claims allege that Officers Simonson, Glasrud, Blade, and Johnson pursued Shannon in a manner so clearly unjustified by any legitimate law enforcement goal so as to be rendered constitutionally infirm. The officers' conduct is alleged to have placed the general public at a significant risk and directly caused Feist's death.

Defendants initially seek summary judgment by arguing that Plaintiff has failed to establish a constitutional violation.[3] Plaintiff

---

**2.** 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

**3.** When a defendant raises qualified immunity as a defense, the proper procedure is to first determine whether the plaintiff has alleged a deprivation of a constitutional right. Only then should a court turn to the key qualified immunity inquiry—analysis of whether the right allegedly violated was clearly established at the time of the events in question. *See County of Sacramento v.*

cites two categories of constitutional violations: (1) unreasonable seizure and excessive use of force in violation of the Fourth Amendment; and (2) deprivation of liberty without due process of law in violation of the Fourteenth Amendment. *See* Amended Complaint, ¶ 85.

### a. Fourth Amendment Violations

The protections of the Fourth Amendment cover only "searches and seizures." U.S. Const., Amdt. 4. No one suggests that a search took place in this case, and the Supreme Court has clearly foreclosed a finding of a seizure in the context of a police high-speed chase. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998). In *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), the Court explained that a seizure "does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 596–97, 109 S.Ct. 1378. *See also Roach v. City of Fredericktown,* 882 F.2d 294, 296 (8th Cir.1989) (determining that no seizure occurred when officer did not intend chase to end by means of collision with vehicle); *Campbell v. White,* 916 F.2d 421, 423 (7th Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 248 (1991) (finding no seizure when police officer accidentally crashed and struck a fleeing motorist); *Horta v. Sullivan,* 4 F.3d 2 (1st Cir.1993) (holding that force not applied "through means intentionally applied" when police cruiser struck fleeing motorcycle).

 In the case at hand, the officers clearly did not intend to terminate Feist's freedom of movement by forcing Shannon's vehicle to crash into him. There was no intentional act by the officers to restrain the liberty of Feist specifically (or even the public generally). Well-established precedent defeats Plaintiff's theory that the police action in this case constitutes a Fourth Amendment violation. Consequently, Plaintiff's claim of "excessive force" under the Fourth Amendment fails as a matter of law. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Greiner v. City of Champlin,* 27 F.3d 1346, 1355 (8th Cir.1994).

### b. Substantive Due Process Violations

The more difficult determination is whether the Defendant officers violated the Fourteenth Amendment's guarantee of substantive due process by engaging in a dangerous chase of a suspect through congested city streets and the wrong direction down a busy interstate highway. A genuine issue of material fact is whether Officer Simonson, the instigating officer in the chase, engaged in conduct that violated Feist's substantive due process rights by Simonson's assessment of the public dangers inherent in a six minute, six mile chase which escalated into a situation likely to culminate in tragedy.

 In order to sufficiently allege a due process violation, a plaintiff must show that the officers' actions in causing the injury constituted an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment. *See Collins v. Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (holding that only the "most egregious official conduct can be said to be arbitrary in the constitutional sense"). In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court first articulated that, to assert a cognizable due process claim, one must demonstrate behavior which "shocks the conscience." *Id.* at 170, 72 S.Ct. 205. This standard has since become a hallmark of substantive due process analysis. *See, e.g., United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The Supreme Court has contemplated that conduct that shocks the conscience is that which is so "brutal" or "offensive" that it does not comport with "traditional ideas of fair play and decency." *Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

*Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043.

The Supreme Court has made it clear that traditional tort law standards do not serve as the appropriate test of what is conscience shocking. "The Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 118 S.Ct. at 1718. In *Lewis*, the Court explained that, instead, "[i]t is ... behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.*

Viewed in the requisite light favorable to the Plaintiff, the conduct in the instant case falls along the culpability continuum as more extreme than negligence. By pursuing Shannon at high speed directly into oncoming traffic on a busy interstate, the officers failed to exercise "due care" from a tort law perspective. However, Simonson and the other officers also could not be said to have "intended to injure" Brian Feist. "Whether the point of the conscience shocking is reached when injuries are produced with culpability ... following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence ... [is] a matter for closer calls," *Id.* at 1718, and ultimately presents a factual issue for jury resolution.

In many cases, the Supreme Court has looked to the standard of "deliberate indifference" to an individual's constitutional rights as the benchmark for substantive due process violations. *See, e.g., City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (holding that pretrial detainee's due process rights violated by deliberate indifference to medical needs); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding prison officials liable for deliberate indifference to prisoner's medical needs). Prior to 1998, a number of circuit courts of appeals applied a deliberate indifference standard in the context of high-speed police chases, *see Lewis v. Sacramento County*, 98 F.3d 434, 441 (9th Cir.1996), *rev'd*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Foy v. Berea*, 58 F.3d 227, 230 (6th Cir.1995); *Medi-na v. City and County of Denver*, 960 F.2d 1493 (10th Cir.1992), while others applied a heightened requirement of "conscience shocking" police conduct. *See Evans v. Avery*, 100 F.3d 1033 (1st Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1693, 137 L.Ed.2d 820 (1997); *Williams v. Denver City*, 99 F.3d 1009 (10th Cir.1996); *Fagan v. Vineland*, 22 F.3d 1296 (3rd Cir.1994).

In 1998, the Supreme Court attempted to rectify the split in the circuits and clarify a standard for evaluation of substantive due process claims in the context of high speed chases. In *Lewis*, Justice Souter required a heightened standard, writing that "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Lewis*, 118 S.Ct. at 1712. The Court looked to the intent of the officers vis-a-vis the fleeing suspect in ruling that "high speed chases with no intent to harm the suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 1720. Defendants argue that *Lewis* sets the bar for all cases involving police chases and renders an analysis under "deliberate indifference" inadequate.

In arriving at a test requiring "intent to harm or increase a suspect's legal plight," in addition to looking for conduct which "shocks the conscience," the *Lewis* court borrowed the standard it had applied in the context of prison riot cases:

Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance' ... A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects,

their passengers, other drivers, or bystanders.

*Id.* at 1720 (citations omitted). Emphasizing the difficulty in assessing these competing obligations, the Supreme Court explained that "deliberate indifference" is an inappropriate standard to apply when "deliberation" itself is impossible. *Id.* at 1719. The facts of *Lewis* readily lend themselves to such an application.

■ In *Lewis,* the defendant police officer drove his patrol car in pursuit of a motorcycle through a residential neighborhood, with little or no traffic on the road, for slightly longer than a minute, covering a distance of just over one mile. At the crest of a hill on the straightaway, the motorcycle skidded to a halt and was instantly struck by the pursuing officer, killing the passenger riding on the back of the motorcycle. *Id.* at 1712. In holding that the officer's split second decision to commence chase did not "shock the conscience," the Court explained: "[the driver's] outrageous behavior was practically instantaneous, and so was [the officer's] instinctive response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to terrorize, cause harm, or kill." *Id.* at 1721. In cases involving split-second judgments, difficult law enforcement choices, and sudden instincts, police officers must be given broad discretion to act. However, undisputed facts of this case present a far different factual predicate which takes the decision making process outside the realm of "split second judgment."

■ In his pursuit of Shannon, Simonson was initially engaging in the same sort of instantaneous judgments and reactions as those required of the officer in *Lewis* or the prison guards in the riot cases. The initial decision to activate his lights and siren and commence pursuit was one made in haste and can easily be justified under the circumstances. However, the situation then escalated step-by-step into one of greater and greater potential for harm to the general public. What began as a chase down residential roads soon escalated to a high-speed run through stop lights and down the wrong way of busy one-way streets. What then became a dangerous pursuit entering a busy interstate eventually became a deadly pursuit back onto the same interstate, this time heading at break-neck speeds the wrong direction against heavy traffic. The entire chase lasted over six minutes and measured over six miles. The wrong-way portion of the chase down the busy interstate covered over 1.2 miles on its own, heading through one tunnel and toward a second—crashing to a tragic halt causing Feist's death.

While Officer Simonson should be afforded deference for his initial decision, the contention that he did not have the time or ability to clearly assess the rising levels of potential danger in the situation should be subject to further analysis. At many points during the chase, Simonson had the opportunity to balance the law enforcement goal of apprehending Shannon for use of a stolen vehicle (a low-level penalty likely carrying no prison time) against the threat to the general public. Each new turn onto one-way streets and especially the accessing the freeway to drive on the wrong side of the median, presented a juncture for reassessment and evaluation of the escalating consequences of the chase. Rather than aborting the chase as the danger increased, the speed and number of pursuing vehicles also increased. While catching a car thief is a law enforcement goal, there is no indication that, had Simonson suspended the chase, the MPD would not have been able to eventually apprehend Shannon. Simonson had secured a physical description and license number of the vehicle; he likely could make an eyewitness identification of the driver; and numerous MPD officers had been notified of the chase and called to the area in the event of a "bail" or exit off the freeway. A review of Simonson's conduct, in light of *Lewis* and other established precedent, reveals that genuine issues of fact exist as to whether his actions "shocked the conscience" for the purpose of a substantive due process claim.[4]

---

4. Plaintiff also argues that the holding of *Lewis* is inapplicable because the death was of an individual who was the object of the chase, rather than a third-party to the chase. As such, Plaintiff argues that the Court's analysis of the officers'

"intent to harm the suspect or increase his legal plight" is not appropriate in a case in which the officers' threat vis-a-vis the general public is at issue. Although not directly addressed in this Order, this significant difference from the *Lewis*

■ In contrast, Officers Blade, Johnson, and Glasrud joined the chase at a much later point and were not parties to the stages of escalation of the situation. They joined in as backup patrol vehicles in support of Simonson's ongoing chase. Plaintiff has produced no evidence to support a finding that the conduct of the three backup officers was "the most egregious" or "shocking of the conscience." The Court, therefore, grants Defendants' Motion for Summary Judgment on Plaintiff's section 1983 claim naming Glasrud, Johnson, and Blade as defendants.

### 2. *Qualified Immunity*

■ Defendants also move for summary judgment based on a claim of qualified immunity. Public officials performing discretionary functions enjoy a qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Cornell v. Woods,* 69 F.3d 1383, 1390 (8th Cir.1995). Qualified immunity protects government officials acting within the scope of their jobs from liability if "their conduct does not violate clearly established statutory or constitutional rights which a reasonable person should have known." *Id.* The central purpose of qualified immunity is "to protect [public officials] from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Plaintiff first bears the burden to show that the right was clearly established. *See Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir.1989). Second, plaintiff must show that a reasonable officer would have believed the conduct was unlawful. *Id.* On summary judgment, a claim of qualified immunity can be defeated if there is a genuine issue of material fact as to whether an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury..." *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727 (citing *Wood v. Strick-*

land, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)).

The concept of "clearly established law" does not imply that any official action is protected by qualified immunity "unless the very action in question has previously been held unlawful," but it does require that "in the light of pre-existing law, the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). One should look both to applicable case law and general principles of legal limitations as understood by reasonable officers. It is not necessary to find a case directly addressing the conduct at issue, but rather "common sense is relevant to the inquiry as to whether the contours of the right at issue were clearly established." *Lewis,* 98 F.3d at 444. The Eighth Circuit has rejected the notion that only cases within the U.S. District Court and corresponding U.S. Circuit Court of Appeals are relevant to the analysis:

> While the identity of a court and its geographical proximity may be relevant in determining whether a reasonable official would be aware of the law (as might the dissemination of information within the profession and the frequency of similar litigation), we do not think that [a limited look only to cases within the circuit] adequately captures what the Supreme Court has meant by its objective test for what is "clearly established."

*Johnson–El v. Schoemehl,* 878 F.2d 1043, 1049 (8th Cir.1989) (*citing Harlow,* 457 U.S. at 819, 102 S.Ct. 2727).

Defendants argue that, since *Lewis,* the seminal Supreme Court case on high-speed chases was not published until 1998, the case law should not be deemed to have been "clearly established" at the time of this chase. This reading of the *Harlow* requirement is far too narrow. Prior to Simonson's chase of August 11, 1996, serious constitutional issues about high-speed chases had been discussed in case law. These cases, as well as internal MPD departmental training guidelines, put a reasonable officer on notice

facts may well be an alternative ground to distinguish *Lewis.* *See* Pl. Mem. in Opp. to Summ. J.

at 27–29.

that liability could arise out of a sufficiently dangerous high-speed chase.

In 1989, the Supreme Court held that law enforcement officers could be held liable under section 1983 for their actions in the course of a high-speed chase. *See Brower,* 489 U.S. at 599–600, 109 S.Ct. 1378. While the Eighth Circuit has yet to have found a police officer liable for injuries resulting out of a police chase, *see Windham v. City of Lowell,* 133 F.3d 924 (8th Cir.1998), *cert. denied,* —— U.S. ——, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998); *Gregory v. City of Rogers,* 974 F.2d 1006, 1012 (8th Cir.1992), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993), cases like *Roach v. City of Fredericktown,* 882 F.2d 294 (8th Cir. 1989), and *Myers v. Morris,* 810 F.2d 1437 (8th Cir.1987), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), have established that, given extremely egregious circumstances, such liability is probable. While the *Roach* court declined to find liability in a civil rights action arising out of a high-speed chase, the door was left open to such a claim in a more aggravated context.

█ In conformity with the established case law, the MPD pursuit guidelines in force at the time of the accident reflected the internal standards for expected conduct in pursuit situations. Section 7–406 of the MPD Manual states that:

> When in pursuit of a vehicle, operation of the squad car shall be with full consideration of existing conditions. In the following circumstances, officers *shall not* initiate and/or continue pursuit:
>
> 1) The pursuit poses an unreasonable risk to the officers and/or the public and the officer can identify, or otherwise establish the identity of, the suspect so that an apprehension can be made at another time.
> 2) Risks due to … vehicle and/or pedestrian traffic outweigh the necessity to immediately arrest the suspect.
> 3) The seriousness of the offense or offenses committed is such that a continued pursuit creates unreasonable risks to the officers or the public.

*See* Pl.Ex. 4, at 5 (emphasis added). In his pursuit training for the MPD, Officer John Johnson attempted to "lower and lessen the

civil liability to the department resulting from police crashes or from crashes eventuating from police pursuits." *See* Bennett Aff., Ex. U, at 21, 24. One of the aspects of Johnson's training was to "teach an officer to analyze those ever-changing conditions … and make a determination at each stage of the chase." *Id.* at 30. Officer Simonson participated in the MPD pursuit training course. In his testimony, Simonson also acknowledged his understanding of the Fourteenth Amendment and its applicability to third-party claims resulting from high-speed chase accidents. *See* Bennett Aff., Ex. BB, at 122–23.

In light of pre-existing case law, MPD pursuit training materials, and Simonson's own admissions, qualified immunity is not applicable and a genuine issue of material fact exists as to whether Simonson knew or should have known the potential consequences of an extremely reckless police chase. *See Johnson–El,* 878 F.2d at 1048. Defendants' Motion for Summary Judgment on Plaintiff's section 1983 Substantive Due Process claim as it pertains to Simonson is, therefore, denied.

## C. Municipal and Supervisory Liability

█ Plaintiff has also asserted claims against the City of Minneapolis and Defendant Nordby in his capacity as a supervisor. Municipal liability under section 1983 is governed by *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell,* municipal liability arises when a constitutional injury directly results from "action pursuant to official municipal policy of some nature." *Id.* at 691, 98 S.Ct. 2018. Such a policy may derive from an "officially adopted and promulgated" policy by the governmental governing body or from a widespread "custom or usage" within the municipality. *Id.; see also Thelma D. ex rel. Delores A. v. Board of Educ.,* 934 F.2d 929, 932 (8th Cir.1991). A governmental "custom" may serve as the basis for section 1983 liability "even though such a custom had not received formal approval through the body's official decision making channels." *Monell,* 436 U.S. at 659, 98 S.Ct. 2018; *see also Jane Doe "A" v. Special School District,* 901 F.2d 642, 646

(8th Cir.1990). Liability may also be established through proof that the alleged misconduct was so persuasive among the non-policy making employees of the municipality as to constitute a custom or usage with the force of law. *See McGautha v. Jackson County, Missouri Collections Dept.*, 36 F.3d 53, 55–56 (8th Cir.1994), *cert. denied*, 515 U.S. 1133, 115 S.Ct. 2561, 132 L.Ed.2d 814 (1995).

Plaintiff's *Monell* claim alleges that the City of Minneapolis "initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern and practice on the part of its police personnel, including defendant Simonson, of unjustified, unreasonable and illegal high-speed police pursuits and other forms of misconduct, and permitted its officers to engage in gross abuses of discretion and unconstitutional misconduct in high-speed police pursuits, including deliberately false reporting of such pursuits." *See* Amended Complaint, ¶ 92. Plaintiff's claim also states that, "[a]s a direct and proximate result of the aforesaid acts and omissions, systematic flaws and policies and customs of defendant City of Minneapolis [and defendant Nordby], defendants Simonson, Johnson, Glasrud and Blade directly caused the accident which killed Brian Feist . . ." *Id.* at ¶¶ 94, 99.

 There is a difference in analysis of the existence of a "custom" as opposed to a "policy" of unconstitutional conduct. *See Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999). A "policy" is an official policy, a deliberate choice of a guiding principle or procedure made by the municipality. *Id.* A municipal policy is not unconstitutional if it might allow for unconstitutional conduct in some instances. *See Handle v. City of Little Rock*, 772 F.Supp. 434, 438 (E.D.Ark.1991). Rather, such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional manner. *Id.* The absence of such a pattern of unconstitutional misconduct must end the court's inquiry. *See Thelma D.*, 934 F.2d at 933. Plaintiff has produced no evidence to show a widespread policy of unconstitutional pursuits by Minneapolis police officers. As Defendants point out, Plain-

tiff has, at best, shown a lack of adequate monitoring and reporting of improper pursuits. There is no evidence of a policy which actually *causes* dangerous, unconstitutional pursuits by its officers. In fact, the record shows that the MPD did maintain an appropriate classroom training course and departmental policy on proper pursuit conduct.[5]

 In order to demonstrate a "custom" of unconstitutional pursuits, Plaintiff must satisfy three requirements:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of the misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Id.* (quoting *Jane Doe A. v. Special School Dist.*, 901 F.2d 642, 645 (8th Cir.1990)). Plaintiff has offered two types of evidence to support the existence of a "custom" of unconstitutional conduct: (1) evidence of inadequate post-accident review, reporting, and discipline; (2) alleged indifference by the City to Simonson's long history of pursuits is argued to be "tacit authorization" of such conduct.

 Although inadequate reporting of an incident or a history of such activity may serve as evidence of a municipal custom in which officers are taught to be unconcerned with punishment, *see id.* at 1204; *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir.1995); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329–31 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987), Plaintiff has not produced evidence to support such a deeply-rooted custom. Mere statistics regarding the number of past pursuits and the lack of resulting disciplinary action is not sufficient to prove a policy or

---

**5.** Plaintiff also fails under the "failure to train" theory as set out by the Court in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiff has not

shown a "failure to train" amounting to a "deliberate indifference to the public's rights." *Id.* at 389–90, 109 S.Ct. 1197.

custom. *See Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995); *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987); *Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985). Further, an adequate post-accident investigation of the August 11 accident would not have *caused* Simonson to engage in his reckless and shocking behavior. Plaintiff has not produced any evidence to show that a lack of concern for discipline caused Simonson's actions.

■■■ Plaintiff has produced no evidence that any of Simonson's past pursuits were unconstitutional by the "conscience shocking" standard. The fact that Simonson has been involved in a number of pursuits and never abandoned a chase does not itself support an inference that he has engaged in a pattern or practice of such conduct. While the chase in this particular case may prove to have been unconstitutional, Plaintiff's claims do not rise to the demands of the *Monell* doctrine. *See Thelma D.,* 934 F.2d at 933 (holding that "relatively isolated incidents cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct"). Defendants' Motion for Summary Judgment of Plaintiff's *Monell* claims is, therefore, granted.

■■■ Liability for the chase supervisor, Defendant Nordby, hinges on whether he did something, or failed to do something, which he ought to have done and which was a proximate cause of the constitutional violation. *See Mackinney v. Nielsen,* 69 F.3d 1002, 1008 (9th Cir.1995). A supervising officer may be held liable for the actions of his subordinates under section 1983 if he exhibits "reckless disregard [for a constitutional violation]" or "fail[s] to train or supervise his officers." *Tilson v. Forrest City Police Dept.,* 28 F.3d 802, 811 (8th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). Nordby was not responsible for the pursuit training provided by the MPD. While Nordby did have supervisory authority over this chase, there is no evidence he actually *caused* the resulting accident, knowingly exhibited "reckless disregard" for his officers' behavior, or failed to adequately complete his supervisory duties. While arguably tardy in not responding to the radio reports of the chase, section 1983 liability by officers does not result from "negligent" behavior. *See Lewis,* 118 S.Ct at 1718. Evidence of record suggests that Nordby was genuinely concerned for the situation and drove his squad car toward the chase scene in order to get a sense of the conditions. Nordby testified that it was Simonson's failure to call-out traffic conditions which prevented him from adequately assessing the level of danger inherent in the chase. Regardless of whether, in retrospect, Nordby "might have called off the chase," Plaintiff has produced no evidence to meet the demanding standard of "deliberate indifference" or "reckless disregard" required by the Eighth Circuit. *See Tilson,* 28 F.3d at 811. Defendants' Motion for Summary Judgment on Plaintiff's section 1983 claims against Defendant Nordby is, therefore, granted.

### D. Conspiracy to Violate Civil Rights

■■■ In Count Four, Plaintiff alleges that Defendant Simonson conspired with the City of Minneapolis to violate Plaintiff's civil rights by "filing false police reports, making false statements to investigators, improperly reporting the circumstances surrounding Feist's death, inadequately investigating the circumstances surrounding Feist's death, [and] attempting to prevent Feist's civil rights cause of action." Amended Complaint, ¶ 104. To prove such a conspiracy, Plaintiff must allege specific facts indicating a mutual understanding among the conspirators to take actions to an unconstitutional end. *See Haley v. Dormire,* 845 F.2d 1488, 1490 (8th Cir.1988); *Putman v. Gerloff,* 701 F.2d 63, 65 (8th Cir.1983) (stating there must be "meeting of the minds" to support allegations of a conspiracy). Plaintiff's conspiracy claim lacks evidence to support a "meeting of the minds" between Simonson and City officials in conspiring to sabotage Plaintiff's civil rights action. The only evidence Plaintiff has proffered is a series of discrepancies in various police reports and a couple of variations in Simonson's testimony. Defendants' Motion for Summary Judgment on Plaintiff's conspiracy claim is, therefore, granted.

### IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

2. Defendants' Motion for Summary Judgment of Count I of the Amended Complaint as it relates to Defendant Simonson is **DENIED.**

3. Defendants' Motion for Summary Judgment of Count I of the Amended Complaint as it relates to Defendants Johnson, Gladrud and Blade is **GRANTED**; Count I as it relates to Defendants Johnson, Glasrud and Blade is accordingly **DISMISSED WITH PREJUDICE.**

4. Defendants' Motion for Summary Judgment on Count II (Civil Rights Violations by Defendant City of Minneapolis), Count III (Civil Rights Violations by Defendant Nordby), and Count IV (Conspiracy to Violate Civil Rights) is **GRANTED**; Counts II, III, and IV are accordingly **DISMISSED WITH PREJUDICE.**