**Timothy HELSETH, Plaintiff,**

v.

**John BURCH and City of Blaine, Defendants.**

**No. CIV. 98–140 JRT/FLN.**

United States District Court,
D. Minnesota.

Aug. 18, 2000.

James R. Schwebel, Schwebel Goetz & Sieben, Minneapolis, MN, Robert Bennett and Eric Hageman, Gartner, Bennett & Schupp, Minneapolis, MN, for plaintiff.

Jon K. Iverson, Paul D. Reuvers, Erstad & Riemer, Minneapolis, MN, for defendant Burch.

Pierre N. Regnier and Joseph E. Flynn, Katherine E Kennedy, Jardine, Logan & O'Brien, St. Paul, MN, and Thomas M Sweeney, Sweeney Borer & Ostrow, St. Paul, MN, for defendant City.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' SUMMARY JUDGMENT MOTIONS

TUNHEIM, District Judge.

Plaintiff Timothy Helseth brings this action against defendants John Burch and the City of Blaine, Minnesota (the "City") under 42 U.S.C. § 1983 for alleged violations of his rights under the First, Fifth, Fourth and Fourteenth Amendments to the United States Constitution arising from a high-speed police chase. Plaintiff additionally charges defendants with conspiracy to deprive him of his constitutional rights, presumably under 42 U.S.C. §§ 1985 and 1986. This matter is before the Court on defendants' motions for summary judgment against all claims.

## BACKGROUND

### I. The High–Speed Chase

The events upon which plaintiff predicates his claims occurred shortly after midnight on August 22, 1995. While on duty in the City of Blaine, police officer William Bott clocked a car driving at approximately 111 miles per hour. The car, containing an eighteen-year-old driver and three juvenile passengers, proceeded through a stop sign without stopping. Bott began pursuing the vehicle with no knowledge about the vehicle or its passengers other than the fact that they were speeding. Bott activated his lights and siren, but the driver of the car, Everett Contois, did not respond and a high-speed chase ensued. The chase proceeded along 109th Avenue, a wide, two-lane roadway in a relatively rural area with few cross-streets or structures appurtenant to the road. Contois later described it as "the local drag street." Contois proceeded through various stoplights, stop signs and other intersections, including at least one highway intersection, at speeds of approximately 70–80 miles per hour. As the chase continued, Contois, followed by Bott, turned southbound onto University Avenue, a more heavily trafficked, multi-lane

roadway. From University Avenue Contois turned onto 101st Avenue and then onto Cloverleaf Parkway, a two-lane roadway proceeding through a residential area.

Defendant Burch was monitoring the chase on his car radio at the intersection of 99th Avenue and Clover Leaf Parkway. Because his own car was closer than Bott's to Contois's vehicle at that intersection, he joined the chase as the primary police car in pursuit. Bott eventually dropped out of the chase at Burch's request.

From Clover Leaf Parkway, Contois turned onto Polk Avenue, a two-lane, residential road. Contois proceeded through several stop signs without slowing down, and continued until he reached a dead-end cul-de-sac at the end of Polk. Contois stopped at the end of the cul-de-sac, but testified that because he felt frightened by Officer Burch he began driving again. He proceeded down a residential driveway, crossed over the lawn of a home, drove over a retaining wall, through a residential backyard, and onto Cottagewood Terrace. Burch followed Contois off-road in pursuit, driving over the same retaining wall and through backyards. Burch testified that he did not see the retaining wall until he was upon it, because visibility at that time of night was limited.

As the chase proceeded down Cottagewood, Burch intentionally rammed his car into Contois's car in order to cause it to spin around and stop, a procedure described by police officers as a "PIT maneuver."[1] This action caused Contois's car to fishtail but was unsuccessful in spinning it around. Burch then rammed the car again with the same result.

The chase proceeded along the service road north of Highway 10. Burch initiated a third PIT maneuver, spinning Contois's car into the ditch between the service road and Highway 10 and causing damage to the car. The vehicle stopped briefly in the ditch when the engine died, but Contois was able to restart it. He drove out of the ditch and onto Highway 10, going eastbound in the westbound lanes into oncoming traffic. Burch followed closely behind. He rammed Contois's car a fourth time, causing it to cross the median on Highway 10 and to proceed eastbound in the direction of eastbound traffic. As a result of all of the hits, Contois's car was severely damaged. The convertible top was partially down, the driver's side window was broken when Contois's head went through it, the trunk was dented and unlatched, and the car began fishtailing and wobbling.

Nevertheless, the chase continued down Highway 10 and onto Highway 65, a four-lane divided roadway. As the chase proceeded out of the limits of the City of Blaine, a Spring Lake Park Police Officer joined in the pursuit behind Burch at speeds of approximately 80 miles per hour. The chase continued onto 81st Street through a residential neighborhood, and towards a heavily trafficked commercial intersection at 81st and University Avenue. The chase ended when Contois entered the intersection against a red light at approximately 80–100 miles per hour and collided with plaintiff's truck. Plaintiff was severely injured in the collision and is now a quadriplegic as a result of his injuries. Another passenger in the truck was killed in the accident. The three passengers in Contois's car were also injured. The entire chase, from the time that Burch joined in, covered a time span of approximately six minutes.

After the chase was over police learned that Contois had been at a party with the three juvenile passengers in his car. During the party, Contois bragged that he could get his car to reach a speed of up to 160 miles per hour. When officer Bott saw the car, Contois was attempting to reach that speed. After the accident, Contois was convicted of third degree murder in addition to criminal vehicular operation and fleeing a police officer.

1. "PIT" stands for "Pursuit Intervention Tactics."

## II. Officer Burch's Employment History & Training

Burch's employment with the City began in June 1978 and continued through February 1999. During that time he received training from the City on the legal aspects of various kinds of police work, including a class on the "Legal Aspects of Emergency Vehicle Operations," and another class on the "Legal Aspects of the Use of Force." Burch took both of these classes prior to the incident resulting in plaintiff's injuries, and testified generally that he had been taught the constitutional limitations that are applicable to police conduct. Burch specifically testified that as a result of his education and experience he was aware that during a high-speed chase a police officer must continually analyze conditions along the chase route and assess whether pursuit should continue. He further testified that when the safety risks of continued pursuit outweigh the benefits of apprehending the suspect, a police officer should terminate the chase. The record reflects that in addition to the legal training he received, Burch also attended a number of driving classes, including two defensive driving classes in March 1983 and May 1989 and a class in pursuit driving in 1979. The record further reflects that Burch represented to the City that he had read and was aware of the City's pursuit and emergency response policies.

During his employment with the City, Burch was involved in a substantial number of traffic collisions while on duty. Twelve of these incidents occurred between September 1978 and June 1989, four of which involved what appear to be high-speed chases.[2] The City gave Burch a "counseling" session in February 1989 regarding one collision and a verbal warning in June 1983 pertaining to his "frequent accidents with squad cars." The City conducted an investigation into the June 1989 incident, and determined that he had been driving at an unsafe speed for the road conditions. During the investigation, Burch opined to his supervisor that if he had to concern himself with safe driving he could not otherwise perform his job effectively. As a result of this investigation, the City suspended Burch without pay for two days.

The record contains no evidence of additional collisions involving Burch until October 1994. On that date, Burch was involved in another high-speed pursuit during which he implemented PIT maneuvers four times on a stolen vehicle that began traveling in the wrong direction through traffic. According to Burch, he initiated the PIT maneuvers only after assessing that the vehicle had slowed down significantly and that it presented a safety risk to oncoming traffic. Eventually Burch was able to stop the car using the PIT maneuver. No one was injured during the incident, and the City did not discipline Burch as a result of his involvement in it.

The record reflects that Burch was also involved in several traffic collisions after the August 1995 accident at issue in this case. These incidents include accidents resulting from high-speed chases occurring in April 1997, June 1997, and September 1997. It appears that the City did not discipline Burch or otherwise determine that his conduct was improper in connection with any of these incidents. Finally, Burch was involved in a collision with a suspect's vehicle in February 1998. The City investigated the incident and determined that it occurred while Burch was attempting to perform an unnecessary PIT maneuver constituting unreasonable use of deadly force against departmental regulations. The City recommended suspension for a period of twelve days as well as termination of Burch's employment. Nevertheless, union negotiations resulted in a settlement pursuant to which Burch was suspended for a period of five days and was not terminated, but began working the

---

**2.** Three of the accidents apparently resulted from collisions with deer.

day shift instead of the night shift. He voluntarily terminated his employment with the City approximately one year later.

## III. Police Department Policies

Pursuant to the police department policy manual in effect at the time of the collision at issue in this case, officers involved in a high-speed chase must continually assess whether the seriousness of the violation justifies continuing pursuit. Officers should discontinue any chase presenting a "clear danger" to the pursuing officers or the public, such as "[w]hen the speed dangerously exceeds normal traffic flow or when pedestrians or vehicular traffic necessitates unsafe maneuvering of the vehicle." In deciding whether to discontinue a chase, officers are instructed to consider "present danger, seriousness of [the] crime, length of the pursuit, whether or not the application of deadly force by the pursuing Officer is justified, and the possibility of identifying the suspect at a later time."

The policy manual contains specific instructions pertaining to the use of intentional ramming techniques such as the PIT maneuver. The manual advises officers that intentional ramming is associated with a high probability of serious injury or death, and states that the practice is discouraged except in the most extreme circumstances. The manual further states that when the suspect vehicle is moving at high speeds, use of intentional ramming techniques will likely be considered deadly force such that laws governing the use of deadly force must be obeyed.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* Summary judgment is required when, after adequate time for discovery and upon motion, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In evaluating a motion for summary judgment, a court must give the nonmoving party the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *See Vette Co. v. Aetna Cas. & Sur. Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *See Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir.1981).

### II. First and Fifth Amendment Claims

At paragraph four of his complaint plaintiff pleads claims against defendants under the First and Fifth Amendments to the United States Constitution. Nevertheless, he asserts no legal theory upon which these claims might rest and alleges no facts that might otherwise implicate the First or Fifth Amendments. Moreover, he ignores these claims entirely in responding to defendants' summary judgment motions. The Court accordingly dismisses

these claims based on plaintiff's failure to prosecute them.

## III. Fourth Amendment Claims

 Plaintiff similarly fails to explain how Burch's conduct may have violated his own Fourth Amendment rights. In *County of Sacramento v. Lewis,* 523 U.S. 833, 843–45, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court rejected a Fourth Amendment claim in the context of a high-speed police chase resulting in a fatal collision. There, the fatally injured plaintiff was a passenger in the motorcycle being pursued, rather than an uninvolved bystander as plaintiff was in this case. During the chase the motorcycle tipped over, and a collision resulted because the police were unable to stop the squad car in time to avoid hitting it. The Court dismissed the plaintiff's Fourth Amendment claim on the ground that no search or seizure had occurred. Although the Court acknowledged that police were attempting to seize the individuals on the motorcycle, it held that a Fourth Amendment seizure occurs only "when there is a governmental termination of freedom of movement *through means intentionally applied."* *Id.* at 844, 118 S.Ct. 1708 (emphasis added) (quoting *Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)); *see also id.* at 845 n. 7, 118 S.Ct. 1708 (holding that "[*a* ]*ttempted* seizures of a person are beyond the scope of the Fourth Amendment" (emphasis added)). Reasoning that the police did not intentionally cause the collision to occur, the Court held that no seizure had taken place.

Plaintiff cites *Hawkins v. City of Farmington,* 189 F.3d 695, 701–02 (8th Cir. 1999), for the proposition that a collision caused during a high-speed police chase can result in a Fourth Amendment violation. The court in *Hawkins* distinguished that case from *Lewis* on the ground that there was evidence from which a jury could conclude that police intentionally caused the collision that stopped the plaintiff's vehicle and resulted in his injuries.

Plaintiff argues under *Hawkins* that Burch's conduct in deliberately ramming his car into Contois's vehicle constitutes a violation of the Fourth Amendment rights of all of the vehicle's passengers. Plaintiff's argument fails for two reasons. First, whether Burch violated the Fourth Amendment rights of Contois or the other passengers in his car is irrelevant, because none of those individuals are parties to this case. Plaintiff has no standing to assert the Fourth Amendment rights of anyone other than himself. There is absolutely no evidence that Burch intentionally caused the collision with plaintiff's truck in order to seize plaintiff or otherwise force his truck to stop. *See Feist v. Simonson,* 36 F.Supp.2d 1136, 1144 (D.Minn.1999) (rejecting innocent bystander's Fourth Amendment claim in the context of a high-speed police chase on the ground that there "was no intentional act by the officers to restrain the liberty of [the plaintiff]"), *aff'd,* 222 F.3d 455 (8th Cir.2000).

Moreover, even if plaintiff could assert Fourth Amendment violations on behalf of Contois, under *Lewis* no Fourth Amendment violation occurred in this case. Although there is evidence that Burch intentionally collided with Contois's car on multiple occasions, those deliberate collisions did not ultimately result in a seizure. Rather, Contois continued to flee from Burch until he collided with plaintiff's truck—an incident demonstrated on the present record to be purely accidental. This case is therefore distinguishable from *Hawkins* on the ground that the means through which the termination of Contois's movement actually occurred, namely, the collision with plaintiff's vehicle, were not intentionally applied by police. Plaintiff's Fourth Amendment claims are dismissed for these reasons.

## IV. Conspiracy Claims

Plaintiff asserts in his complaint that defendants engaged in a conspiracy to de-

prive him of his civil rights by filing false police reports, making false statements to investigators, improperly reporting the accident, inadequately investigating the accident, attempting to prevent plaintiff from filing his civil rights claims, and otherwise ratifying and acquiescing in violations of his substantive due process rights. Plaintiff points to no evidence whatsoever in support of these assertions and fails to address his conspiracy claim in any fashion in response to defendant's summary judgment motion. In order to state a cognizable claim of conspiracy under federal civil rights law, a plaintiff must be able to demonstrate a mutual understanding or meeting of the minds among the alleged conspirators to deprive him of his civil rights. *See Haley v. Dormire*, 845 F.2d 1488, 1490 (8th Cir.1988); *Feist*, 36 F.Supp.2d at 1150 (dismissing virtually identical conspiracy claims on grounds of insufficient evidence). Plaintiff has failed to produce any evidence to support an inference that there was a meeting of the minds between Burch and other City officials to deprive him of his civil rights. His conspiracy claims are dismissed for these reasons.

## V. Due Process Claim Against Burch

### A. Individual capacity claim pleaded

■ Burch seeks dismissal of plaintiff's claims against him on both procedural and substantive grounds. Burch specifically contends that plaintiff's claims against him must be dismissed because plaintiff's complaint did not explicitly name him in his personal capacity. The Eighth Circuit has held that in order to state a section 1983 claim against a government official in his or her individual capacity, the complaint must clearly indicate that it is an individual capacity suit. *See Nix v. Norman*, 879 F.2d 429, 431–32 (8th Cir.1989) (applying this rule strictly in the context of claims against state officials on the basis of Elev-

enth Amendment principles); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir.1999) (applying the *Nix* rule in the context of claims against municipal employees). The Eighth Circuit has expressed a strong preference for inclusion of the precise words "individual capacity" in pleading individual capacity suits against government officials under section 1983. *See Jackson v. Crews*, 873 F.2d 1105, 1107 (8th Cir.1989) ("If plaintiff wishes to sue defendants in both capacities, the following language would suffice: Plaintiff sues each and all defendants in both their individual and official capacities."). Nevertheless, when a complaint is otherwise sufficient to put government officials on notice that they are being sued personally, the Eighth Circuit has permitted the plaintiff's individual capacity claims to proceed. *See id.* (recognizing that the complaint was sufficient to state individual capacity claims even though it did not use those terms, but cautioning future litigants that use of such language would "be much better").

The Court has closely scrutinized plaintiff's complaint and finds that it is plainly sufficient to put Burch on notice of an intent to sue him in his individual capacity, although the phrase "individual capacity" appears nowhere in the complaint. The complaint notably asserts separate counts against Burch and against the City. Count I specifically asserts claims only against Burch.[3] Importantly, under this Count plaintiff seeks both compensatory and punitive damages—a remedy that is unavailable against government entities. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Count II asserts claims only against the City and does not state a claim for punitive damages. Thus, plaintiff's claims against Burch and against the City are distinctly separate. Moreover, in his prayer for relief plaintiff clearly seeks both

**3.** Count I also states a claim against Bott, whom plaintiff later dismissed from this ac- tion.

compensatory and punitive damages from Burch individually. The complaint specifically states a damages claim against Burch for twelve million dollars, but states a separate claim against the City for only fifty-thousand dollars and injunctive relief. Given the manner in which plaintiff structured his complaint, the only reasonable interpretation of it is that it asserts claims against Burch in his individual capacity in addition to claims against the City. Thus, the complaint is sufficient to put Burch on notice of plaintiff's intent to sue him personally and not just in his official capacity as an agent of the City.

Moreover, it is apparent that Burch understood that he is being sued individually. Burch has retained separate counsel from the attorneys retained by the City. Moreover, he focuses his defense on the doctrine of qualified immunity, a defense that is not available to government entities. *See Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The Court finds for these reasons that plaintiff has pleaded claims against Burch in his individual capacity and accordingly rejects Burch's motion for dismissal on these grounds. Nevertheless, in light of *Johnson*, the Court also holds that it would have been more appropriate for plaintiff to state explicitly in his complaint that he pleads claims against Burch in his individual capacity. Plaintiff requests an opportunity to amend the complaint in order to state his claims against Burch individually with greater clarity. In light of these concerns, plaintiff's request is granted.

Burch argues that permitting such an amendment would result in prejudice to him because he has not had an opportunity to conduct sufficient discovery on the issue of punitive damages. Nevertheless, for the above reasons Burch was clearly on notice that plaintiff asserted a punitive

damages claim against him personally. Moreover, Burch does not state with any specificity what information he would seek to discover that he does not already have in his possession.[4] Burch has thus failed to demonstrate any degree of prejudice that would militate against an amendment to the complaint. Plaintiff's request to amend the complaint is granted for these reasons.

### B. Qualified immunity

Burch forcefully asserts that plaintiff's claims against him must be dismissed under the doctrine of qualified immunity. In addressing whether a government official is entitled to qualified immunity against claims under section 1983, courts must first determine whether the plaintiff has alleged an underlying violation of a constitutional right. *See Lewis*, 523 U.S. at 1714 n. 5, 118 S.Ct. 1708 (stating that courts evaluating the qualified immunity defense should determine whether a plaintiff has alleged a constitutional deprivation before addressing other elements of the defense). Upon finding that a constitutional violation occurred, courts must assess whether the right was clearly established at the time of the challenged conduct, and whether a reasonable official would know or should have known that his or conduct violated that right. *See Feist*, 222 F.3d at 462 (citing *Foulks v. Cole County*, 991 F.2d 454, 456 (8th Cir.1993)).

#### 1. Constitutional violation

 Burch contends that plaintiff's Fourteenth Amendment claim against him fails because plaintiff has not demonstrated that a violation of his substantive due process rights occurred. The Supreme Court addressed the culpability standard that courts should apply to due process claims arising in the context of high-speed police chases in *Lewis*. 523 U.S. at 845–

---

**4.** It is difficult to guess what information Burch might seek to obtain from plaintiff, whose participation in the accident was undisputedly that of an innocent bystander, and whose personal finances are not properly admissible as a defense to his punitive damages claim.

55, 118 S.Ct. 1708. There, the Court rejected the Ninth Circuit's holding that "deliberate indifference" and "reckless disregard for life" are sufficient to state a due process claim based on a collision resulting from a high-speed police pursuit. *See id.* at 854, 118 S.Ct. 1708. Instead, the Court held that the police officer's conduct in this context must "shock the conscience" before a constitutional violation will arise. *See id.* at 846, 118 S.Ct. 1708 (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). The Court opined that in some contexts, when an official has the opportunity to reflect upon and consider his or her options, "deliberate indifference" to a claimant's constitutional rights appropriately states the level of culpability necessary to demonstrate conscience-shocking behavior. *See id.* at 853, 118 S.Ct. 1708; *see also id.* at 850, 118 S.Ct. 1708 (noting that deliberate indifference is sufficient to state a due process claim based on failure to meet the medical needs of a prisoner awaiting trial). The Court nevertheless held that when an official is required to make snap decisions, deliberate indifference is not an appropriate standard since the official has no real opportunity to deliberate. *See id.* at 851, 118 S.Ct. 1708. In this context even "precipitate recklessness" is insufficient to shock the conscience. *Id.* at 853, 118 S.Ct. 1708. The Court concluded that, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." *Id.* at 854, 118 S.Ct. 1708.

In *Feist,* 222 F.3d at 462–465 the Eighth Circuit interpreted the Supreme Court's holding in *Lewis* narrowly. Recognizing that the holding in *Lewis* rested upon the instantaneous decision-making process usually attendant to high-speed pursuit, the court held that "[i]n situations where an officer could have actually deliberated, courts are to apply the deliberate indifference standard to determine whether the behavior was conscience

shocking." *Id.* at 461. Thus, although *Feist* involved a high-speed chase similar to the one at issue in *Lewis,* the court affirmed the district court's holding that the deliberate indifference standard applied because the facts alleged indicated that the officer involved had an opportunity to exercise considered judgment. *See id.* at 463–465. In denying summary judgment, the district court observed that while the high-speed chase at issue in *Lewis* continued for little more than a minute over a distance of just over a mile through a consistently low-trafficked, residential area, the chase in *Feist* lasted for more than six minutes with escalating levels of danger along the chase route. *See Feist,* 36 F.Supp.2d at 1146 ("At many points during the chase, Simonson had the opportunity to balance the law enforcement goal of apprehending Shannon for use of a stolen vehicle ... against the threat to the general public. Each new turn onto the one-way streets and especially the accessing the freeway to drive on the wrong side of the median, presented a juncture for reassessment and evaluation of the escalating consequences of the chase.").

The facts alleged in the case at bar are strikingly similar to those asserted in *Feist.* Indeed, they are so similar that Burch conceded during the hearing on defendants' motions that if the Eighth Circuit affirmed the lower court's decision in *Feist,* as it now has, the claims against him should proceed to trial. As in *Feist,* the chase at issue in this case lasted for approximately six minutes at extraordinarily high speeds and covered increasingly dangerous road conditions. The chase began in a relatively safe, rural area on a wide road with few obstructions known as the local "drag street," but continued through residential and more heavily trafficked commercial areas, through numerous stop signs and stoplights, and onto a highway proceeding in the opposite direction of oncoming traffic.

Defendants might argue that the traffic conditions at issue in *Feist* were much worse than those at issue in this case. There, the chase took place in mid-afternoon in an urban area, close to a tunnel, on one of the busiest freeway intersections in Minnesota. In this case, the chase took place shortly after midnight in a suburban area on a somewhat smaller highway. Nevertheless, other factors not present in *Feist* make the pursuit in this case equally as dangerous. Here, Burch not only chose to pursue the suspect's car through residential neighborhoods, but actually drove his squad car through the driveways and yards of local residences. Burch admitted that he could not see the retaining wall that he drove over until it was too late to avoid it. Thus, it seems highly unlikely that he could have avoided hitting any pedestrians walking in the off-road areas where he drove. While the late hour during which the chase occurred likely resulted in a significant decrease in traffic, it also substantially decreased visibility both for the police and the suspect they were pursuing. Moreover, unlike the suspect vehicle being pursued *Feist*, Contois's car sustained significant damage during the chase as a result of the PIT maneuvers that Burch implemented. Burch continued his pursuit despite the fact that the car began fish-tailing across the road as a result of the damage, thus increasing the danger to the public that Contois would lose control of the vehicle.

At each significant juncture along the chase route—before pursuing Contois off-road onto residential property, before chasing him against oncoming traffic onto a highway, before striking Contois's vehicle multiple times, and at the point in time when Contois's badly damaged vehicle began swerving—Burch had an opportunity to weigh the importance of apprehending Contois against the escalating threat to public safety that the chase presented. Indeed, Burch testified that during the

chase it was possible for him to assess continually whether the goal of apprehending Contois outweighed the risks to public safety, that he had time to make considered decisions about the tactics that he used during the chase, and that he had time to think about the impact of the damage to Contois's vehicle on its mechanical functioning. Nevertheless, Burch continued the chase despite the fact that Contois was suspected of nothing more than speeding, a misdemeanor, and fleeing a police officer, a gross misdemeanor. *See Feist*, at 463–464 (noting as significant the fact that police had no reason to suspect that the driver was guilty of anything more than a low-level felony).

The evidence thus supports a conclusion that Burch engaged in conscious deliberation rather than reflexive conduct. Under these circumstances the deliberate indifference standard applies. *See id.* at 464–465. Moreover, in light of the serious threat to public safety that the chase presented and the relatively inconsequential crimes with which Contois was suspected, the Court finds that a material question of fact exists as to whether Burch acted with deliberate indifference to public safety and thus to plaintiff's constitutional rights.

Furthermore, even if the Court were to assume that *Lewis's* "intent to harm" standard applies broadly to all high-speed chases, the evidence supports a reasonable conclusion that Burch possessed the requisite level of culpability. Burch was keenly aware, as a result of his training and experience, that using a PIT maneuver against a car moving at high speeds causes a high probability of serious injury or even death. Yet, he used the maneuver on Contois's vehicle at least four times while it was moving at high speeds, under conditions that plainly did not justify the use of deadly force.[5] Moreover, he continued to use

---

5. Burch's use of the PIT procedure in order to force Contois's car into the correct lane of traffic was perhaps justified as a public safety

measure. Nevertheless, he initiated the PIT procedure at least three times before Contois began driving against traffic.

the procedure even after it became evident that the vehicle was badly damaged and that if left alone the driver would likely stop due to the associated mechanical difficulties.[6] A reasonable jury could infer from these facts that Burch intended to harm Contois and the three juvenile passengers in his car. Under either the "deliberate indifference" standard or the "intent to harm" standard, a genuine fact issue exists as to whether Burch's behavior was truly shocking to the conscience. For these reasons, plaintiff has met his burden of establishing that a constitutional violation occurred.

### 2. Clearly established law

■ Burch contends that even if a deprivation of plaintiff's constitutional rights occurred, the law pertaining to those rights was not sufficiently established at the time of the chase to give rise to legal liability. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (providing that government officials are immune from civil rights liability unless the law clearly established that their conduct was unlawful at the time that it occurred); *see also Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989) (stating that a right is not clearly established unless its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right"). The precise conduct at issue need not have been held unlawful for the right violated to be "clearly established," however, "in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In *Feist,* at 464–465, the Eighth Circuit held it was well-established long before August 1996 that police could be held liable under the Due Process Clause for their conduct during high-speed pursuits. In so holding, the court cited to numerous authorities from various circuits indicating

that substantive due process liability could arise in this context. *See id.* (citing *Roach v. City of Fredericktown,* 882 F.2d 294, 297 (8th Cir.1989); *Evans v. Avery,* 100 F.3d 1033, 1038 (1st Cir.1996); *Webber v. Mefford,* 43 F.3d 1340, 1344 (10th Cir.1994); *Fagan v. City of Vineland,* 22 F.3d 1296, 1308–09 (3rd Cir.1994); *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 723 (4th Cir.1991); *Checki v. Webb,* 785 F.2d 534, 538 (5th Cir.1986)). The chase at issue in the case at bar occurred in August 1995, approximately one year prior to the chase at issue in *Feist.* Nevertheless, all but one of the precedents upon which the *Feist* court relied were published prior to August 1995. For this reason, and because the facts in this case are remarkably similar to the facts alleged in *Feist,* the Court concludes that two cases are not materially distinguishable for purposes of analyzing this issue. The Court accordingly follows the Eighth Circuit's guidance, and holds that the law pertaining to due process liability in this context was clearly established at the time when the alleged violation of plaintiff's constitutional rights occurred.

### 3. Reasonableness of Burch's conduct

■ "Once it has been established that the alleged constitutional violation is supported by clearly established law, a qualified immunity defense will ordinarily fail, since a reasonable government actor should or would have known the law governing his conduct was a constitutional principle supported by clearly established law." *Id.* at 465 (citing *Buckley v. Rogerson,* 133 F.3d 1125, 1131 (8th Cir.1998)). Nevertheless, when a government official can affirmatively show that he neither knew nor should have known that his conduct was unconstitutional, he may be entitled to qualified immunity. *See id.*

■ Burch contends that he is entitled to qualified immunity because a reason-

---

**6.** Contois testified that he continued to flee because he became terrified, when Burch be-

gan ramming his car, that the police were attempting to kill him.

able police officer in his position would not have known that his conduct violated a constitutional right. The evidence does not support this assertion. Burch testified that based on his training, education and experience he was aware of the specific limitations of police activity required by the Constitution in connection with substantive due process and the use of deadly force, including deadly force with a motor vehicle. He further testified that he understood that police practices and policies pertaining to deadly force and emergency vehicle operation mirror the protections established under the Constitution. Finally, he stated that he was aware that civil liability might arise from the manner in which he operated his squad car during high-speed pursuits, and that he understood the need for continuous evaluation of the surrounding conditions in order to avoid such liability. In light of these admissions and the development of the law at the time when the chase occurred, the Court finds that a reasonable officer in Burch's position should have known that his conduct might result in a constitutional violation. Burch's motion for summary judgment on the basis of qualified immunity is denied for these reasons.

## VI. Due Process Claim Against the City

■ The City challenges plaintiff's due process claim against it on the ground that

plaintiff has failed to establish the requisite elements for section 1983 liability against a municipality.[7] In contrast with common tort law, section 1983 does not give rise to vicarious liability against a government entity simply because it employs an official who has violated the Constitution.[8] *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, municipal liability only arises when a claimant can demonstrate that the alleged unconstitutional conduct resulted from an official government policy or from practices of government officials that are so well-settled as to constitute a "custom or usage" with the force of law. *See id.* at 690–91, 98 S.Ct. 2018. Moreover, as the Supreme Court recognized in *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), a municipality may be liable under section 1983 when it has a policy or custom of inadequate training or supervision and that inadequacy amounts to deliberate indifference to the constitutional rights of others.

Although plaintiff argues at length about the legal standards applicable to his claims against the City, he supports his arguments with very little reference to the facts of this case. He points to no formal municipal policy from which his claims against the City might arise. Indeed,

7. The City separately challenges plaintiff's purported punitive damages claim against it on the ground that municipalities are immune from such damages under section 1983. *See City of Newport*, 453 U.S. at 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). For the above reasons the Court does not interpret plaintiff's complaint to state a punitive damages claim against the City, but rather, only against Officer Burch in his individual capacity. The City's argument on this issue is therefore unwarranted.

8. Plaintiff argues that section 1983 supports claims against municipalities that are "derivative" of claims against individual municipal employees and are not based on the municipalities' own misconduct. This statement of the law is incorrect. As *Monell* makes clear,

derivative or vicarious liability never arises under section 1983. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *see also Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999). Rather, a cognizable civil rights claim against a municipality only exists when the claimant demonstrates that a municipal policy or custom was the "moving force" behind a violation of the claimant's constitutional rights. *See Mettler*, 165 F.3d at 1204 (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). This requirement may be satisfied even when no individual government official is personally liable for violating the claimant's constitutional rights, as long as an underlying constitutional deprivation resulted from the municipality's culpable conduct. *See Doe v. Washington County*, 150 F.3d 920, 922 (8th Cir.1998).

plaintiff argues forcefully that Burch violated departmental policies by continuing the pursuit that ultimately resulted in his injuries. Thus, he does not state a claim based upon an unconstitutional municipal policy.

He similarly does not appear to base this claim on an unconstitutional custom or practice among police department employees. In order to establish the existence of such a custom, plaintiff must demonstrate:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Mettler,* 165 F.3d at 1204 (quoting *Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir.1998)) (alterations in the original). Although plaintiff has shown that Burch was involved in numerous work-related traffic accidents during his career with the City's police department, he offers no evidence of any police officer other than Burch who has engaged in inappropriate pursuit tactics. Thus, it is questionable whether the misconduct at issue in this case could be deemed to be sufficiently "widespread" within the City's police force to engender municipal liability.

 Moreover, the record does not otherwise establish that Burch engaged in a such a well-settled, continuing, or persistent pattern of misconduct as to have the force of law. The majority of his recorded traffic accidents occurred either after the collision at issue in this case or at least six years prior to it. Between June 1989 and August 1995, the date of the collision, only a single incident in October 1994 occurred. Although the record reflects that Burch

used PIT maneuvers against a suspect's vehicle on that occasion, there is no evidence that his conduct in doing so was in any way improper. Rather, it appears that Burch may have acted appropriately on that occasion by using the technique only when the suspect began endangering the public, and by slowing the suspect's vehicle first in order to reduce the likelihood of serious injury. This incident did not end in an accidental collision and did not result in any injury to the suspect, police, or third parties. *Cf. Feist,* 36 F.Supp.2d at 1150 (reasoning that, "[t]he fact that [the defendant police officer] has been involved in a number of pursuits and never abandoned a chase does not itself support an inference that he has engaged in a pattern or practice of such conduct," when the past pursuits in evidence were not shown to be unconstitutional). Thus, at the time of the collision in this case, it does not appear that Burch had an established pattern of unconstitutional misconduct that was either continuous or persistent.

Furthermore, plaintiff has not demonstrated that the City was so unresponsive to Burch's misconduct as to be deemed deliberately indifferent to it. The City reprimanded Burch on more than one occasion in connection with his poor driving record and suspended him as a result in June 1989. After that suspension Burch's record remained clear, with the exception of the October 1994 incident, until the collision at issue in this case occurred. The record does show that Burch was involved in a series of frequent accidents involving high-speed chases in 1997 and 1998. Nevertheless, the City ultimately responded to these incidents by suspending Burch for a period of six days, forcing him to work the day shift instead of the night shift, and even recommending his dismissal. These actions are not indicative of indifference to Burch's behavior. Plaintiff has therefore failed to present a viable *Monell* claim based upon an established

custom or pattern of unconstitutional conduct among police department employees.

■ Plaintiff focuses his claim against the City on its allegedly unconstitutional policy or practice of failing to supervise and train Burch adequately. *See Canton,* 489 U.S. at 388, 109 S.Ct. 1197. Plaintiff specifically complains that in light of Burch's driving record, the City should have assigned him to a desk job, required him to work the day shift, or otherwise limited his participation in high-speed chases. Plaintiff further contends that the City should have provided Burch with special driver's training in response to his high accident record.

Upon reviewing the record, the Court finds the evidence insufficient to permit plaintiff's failure-to-train claim to proceed. Had the City modified Burch's responsibilities or required him to undergo additional driver's training classes, the possibility of collisions such as the one resulting in plaintiff's injuries might have been reduced. Nevertheless, plaintiff cannot sustain his burden of proof simply by showing that the City could have done more to prevent the alleged constitutional deprivation from occurring. Rather, plaintiff must demonstrate that the City's failure to train and supervise Burch amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197.

In light of the significant amount of relevant training that Burch received from the City, plaintiff has failed to meet this requirement. Burch received specialized training in both the legal limits of using force and the legal consequences associated with operating his squad car. He also took classes during his tenure with the City on defensive driving and driving in high-speed chases, and was made aware of the City's policies on pursuit, emergency response, and intentional ramming techniques. Plaintiff complains of no particularized deficiency in any of Burch's coursework. As this evidence demonstrates, far from acting with indifference to plaintiff's

rights, the City has made an affirmative effort to train its officers in order to prevent the kind of tragic collision that occurred in this case.

Plaintiff similarly fails to provide sufficient evidence that the City neglected to supervise Burch properly. Removing Burch's emergency response duties from him as a result of his high accident record likely would have prevented this tragedy. Nevertheless, the City's decision to forgo such severe discipline and to suspend him instead is simply not such an ineffectual or feeble response as to amount to deliberately indifferent supervision. The City's motion for summary judgment against plaintiff's *Monell* claim is granted for these reasons.

### ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The City's motion for summary judgment [Docket No. 22] is **GRANTED**.

2. Count II of plaintiff's complaint is **DISMISSED, with prejudice.**

3. Defendant Burch's motion for summary judgment [Docket No. 26] is **GRANTED in part** and **DENIED in part**.

4. Count III of plaintiff's complaint (Conspiracy) is **DISMISSED, with prejudice.**

5. The portions of Count I arising under the First, Fifth, and Fourth Amendments to the United States Constitution are **DISMISSED, with prejudice.**

6. Defendant Burch's motion for summary judgment is **DENIED** in all other respects.

7. Plaintiff's request for permission to file an amended complaint [Docket No. 28] is **GRANTED**. Plaintiff may amend the complaint for the limited purpose of clarifying that he sues defendant Burch in his individual capacity. Plaintiff shall file the

amended complaint within fourteen (14) days from the date of this Order.